FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

99 JUN -3 AM 9: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

RAMONA GARTMAN,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )        CV 97-BU-2117-M
                                   )
MINACT, INC.,                      )        **ENTERED**
                                   )
        Defendant.                 )        JUN 0 3 1999
                                   )

---

## Memorandum Opinion

---

This cause comes on to be heard on a renewed motion for summary judgment filed by the defendant, MINACT, Inc. ("MINACT"), on April 1, 1999. In its motion, the defendant contends that the plaintiff is incapable of demonstrating that a reasonable trier of fact could find that she was the victim of discrimination based upon race in violation of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a & 2000e, *et seq.*, and in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1981. The plaintiff responds that she can demonstrate a genuine issue of triable fact on her various claims of race discrimination.[1]

---

[1] The defendant raises two other arguments for granting summary judgment beyond the argument that the plaintiff cannot raise a genuine issue of material fact with regard to the substance of her claims. First, it contends that the plaintiff submitted her response brief on April 25, 1999, rather than on April 22, 1999, the date set forth in the court's scheduling order. However, the

36

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. The movant's burden is not meager; it must illuminate for the court through the materials provided to it the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil*

---

plaintiff was permitted, by this court, to file her response brief three days after the date set forth in the scheduling order and acknowledge the extension in a letter to be sent to the court and opposing counsel. The court received its copy of the acknowledgment promptly thereafter. The court assumes that the same acknowledgment was sent to the defendant. The court will not strike the response brief and grant summary judgment on this basis. Even if, in fact, the defendant did not obtain a copy of the acknowledgment from the plaintiff, the court does not find that it was irreparably harmed such as to require striking the plaintiff's brief.

Second, the defendant contends that because the trustee in bankruptcy did not abandon the plaintiff's claims until fifty-six days after the date requested by the court in an order entered by United States District Judge Robert B. Propst, the plaintiff should be precluded from bringing her claims. However, the plaintiff promptly sought to reopen her bankruptcy case after the court had ordered her to determine if the trustee sought to abandon the plaintiff's claims. That the trustee took an inordinate amount of time to actually attend to the matter of the plaintiff's claims is not a justification for punishing the plaintiff.

*Company*, 32 F.3d 520, 523 (11ᵗʰ Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11ᵗʰ Cir. 1988). "Tenuous insinuation" and empty speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *Cf. Mesnick v. General Elec. Co.*, 950 F.2d 816, 820 (1ˢᵗ Cir. 1991), *cert. denied*, 504 U.S. 985 (1992).

While the court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the Rule "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting its claims. *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5ᵗʰ Cir. 1996). "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11ᵗʰ Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11ᵗʰ Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11ᵗʰ Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135

F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## Facts[2]

On October 1, 1995,  MINACT took over the management operations of the Gadsden Job Corp Center ("Center") from its predecessor, Career Systems Development.[3] While MINACT mostly imported new management personnel from its other operations into the Center, MINACT chose to hire some members of its management from Career Systems Development personnel who had previously worked at the Center. Among those hired by MINACT to work in a supervisory capacity was the plaintiff, Gartman, a white female.

While working with Career Systems Development, Gartman was employed as the Manager of Education and Training. After she learned that MINACT would be taking over operations at the Center, she applied for the position that she believed would be most similar to the position she occupied with Career Systems Development, that of Director of Programs for MINACT. At her interview for the position before Curtistene Eoff ("Eoff"), the Center Director, Jean Lenard, the Vice-President of Operations, and Richard Colgan, MINACT's Corporate Project Manager, the plaintiff was informed that her duties as Director of

---

[2]  "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record." *Underwood v. Life Ins. Co. of Georgia*, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). The factual narrative presented here is developed in the light most favorable to the plaintiff and with all *reasonable* inferences drawn in support of the plaintiff's position. *See Hunt v. Cromartie*, — U.S. —, —, — S.Ct. —, —, 1999 WL 303677 at *6 (May 17, 1999). Whether this narrative would be borne out in the facts developed at trial is another matter. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3]  MINACT and Career Systems Development are management training corporations to whom the supervision of Job Corps Centers are contracted.  The Jobs Corps Centers are federally funded facilities at which "disadvantaged" or "troubled" youth are given academic and vocational training.  Students of the Job Corps Centers can, if they desire, live in dormitories run by the Job Corps Center.

Programs would include oversight of the Academic, Vocational, and Residential Life and Training areas of the Center.[4] The plaintiff, upon receiving this information concerning her job duties, responded that although sufficiently prepared by her previous work experience with the Academic and Vocational aspects of the Center to assume those functions of the Director of Programs position, in order to competently manage the Residential Life and Training aspects of her job, she would need instruction and training in the management of that area. Eoff concurred with the plaintiff's self-analysis and responded that the plaintiff, upon being hired into the position, would receive training and aid. On September 22, 1995,

---

[4] In the job description for plaintiff's position published by MINACT, the essential functions of the plaintiff's position are listed as:

> 1. Develops and implements the Center's Residential Living and Training Programs and directs all division functions, activities and programs.
> 2. Plans, develops and implements policies and procedures according to the PRH, the Job Corps Residential Living Manual, Training Handbooks, and Corporate goals and objectives.
> 3. Directs and implements the Center's student recreational, avocational, cultural and leisure time programs.
> 4. Directs the development of the Center's student accountability program.
> 5. Directs the development of the Center's Student Government and Leadership Programs and Systems.
> 6. Assures that students' progress is evaluated and that the necessary changes in programs/schedules are made.
> 7. Develops a contingency plan for the staffing of the dorm life area and in the classrooms, in the absence of regular staff.
> 8. Assists in obtaining academic accreditation for educational classes.
> 9. Develops and implements in-service training for the division's staff.
> 10. Ensures that approved curriculum is taught in individual classrooms.

Defendant's Exhibit I. Other functions listed include the development of job standards and staff work assignments, evaluation and training of departmental and Center staff, operation of Center vehicles and other duties designated by staff. She was also required to supervise various subordinates, including the Supervisor of Academics, the Manager of Social Development and the Supervisor of Vocation. However, there existed no Vocational Supervisor at the Center and the responsibilities of a Vocational Supervisor fell upon the plaintiff.

the plaintiff was offered the position of Director of Programs at a starting salary of
$43,992.00 per year, to be paid in bi-monthly increments. The plaintiff accepted the job.[5]

At the same time that the plaintiff began work at MINACT as Director of Programs,
Eddie Exford ("Exford"), a black male, was hired into the position of Manager of Social
Development, a position overseeing certain functions of Residential Life and Training and
under the plaintiff's supervision. According to the plaintiff, soon after Exford's assumption of
that role, various employees began to approach the plaintiff about Exford's management
style. According to the people to whom Gartman spoke, Exford's treatment of them was
condescending and humiliating. Gartman first brought the complaints to Exford's attention;
he denied being in any way condescending, and, although complaints had been received by
Gartman from both the black and white staff of the Center, Exford accused her of trying to
separate the Center's black and white staff.

Gartman reported Exford's behavior to her superior, Eoff, and for the first two weeks
after reporting the complaints, Eoff expressed sympathy and stated that she would "take care"
of Exford. However, in mid-October, Eoff changed her stance. Eoff inquired why complaints
were being made to the plaintiff, but not to Eoff herself.[6] And, after speaking with Exford,
Eoff accused the plaintiff of race-baiting in the same manner as Exford had previously accused
the plaintiff. Exford, now with an ally in the plaintiff's superior, pressed his assault, referring
to the plaintiff as the "white power" or the divisor of blacks and whites in the Center,
allegedly in an attempt to himself divide the Center along racial lines and to further his own
position. Often, he did this in meetings of the Performance Measurement System
Committee, attended by the plaintiff and other management personnel. By the beginning of

---

[5] The first six month period of employment with MINACT is, under the employer's
guidelines, probationary. During that period, the employee is rigorously evaluated and those
evaluations are placed in the employee's file.

[6] Plaintiff's apparent response was that the non-management personnel who had worked for the
Center during the time that it was run by Career Systems Development were more familiar with her than with
MINACT personnel, including Eoff.

November, the plaintiff ceased to report staff complaints to Eoff, because, allegedly, reports of those complaints continued to elicit the same remarks of derision by her.

On November 1, 1995, Gartman was informed by Eoff, in a meeting with her and Exford, that the plaintiff was performing poorly as the individual in charge of Residential Life and Training. As such, Eoff stated, she would transfer control of the area to Exford. Within a week, Eoff changed her mind and left control over Residential Life and Training with the plaintiff.[7] By this point the plaintiff had received no training in the Residential Life and Training area, although in the plaintiff's interview, Eoff had indicated the plaintiff would receive such training. Further, while both Eoff and Exford had in their possession copies of operating procedure manuals from other sources, the plaintiff claims that she was not permitted access to these until late in her term of employment with the defendant and then under very limited circumstances.

On November 6, 1995, the plaintiff received an evaluation by Eoff for her first month of employment. In it, Eoff criticized the plaintiff for not spending time in the Residential area of the Center campus, referred to the plaintiff as "silently rebellious," and indicated that the plaintiff had failed to learn or to make the effort to learn about the operations of the Residential Life and Training aspects of her position.[8] The plaintiff responds that all of these statements about her work performance are untrue. First, she contends, she was available to

---

[7] The plaintiff apparently contends that Eoff left her with control over Residential Life and Training in order to further document poor performance, providing a fabricated basis for her ultimate termination.

[8] The November 6, 1995, evaluation lists a number of concerns, but largely they are all facets of the three problems listed in the body of the opinion. Many of the complaints include specific instances of the plaintiff's failure to promptly complete certain tasks and a reluctance by the plaintiff to perform tasks that Eoff requested her to undertake. However, the plaintiff contends, many of the tasks of which Eoff complains were performed as Eoff had asked. Eoff consistently demands that the plaintiff supervise her subordinates, but, according to the plaintiff, the subordinates who she is told to supervise, including Exford and Ms. Wrenn, she is not permitted to discipline. The plaintiff avers that the exercise of discipline over Exford and Wrenn was reserved to Eoff who, in turn, never exercised it. Further, plaintiff complains that Exford refused to listen to her directions from the beginning of her employment with MINACT.

the Residential Life and Training facility on evenings and weekends.[9]  Second, the plaintiff

contends, her rebelliousness was only the perception of Eoff, who had formed a pre-conceived

misconception of the plaintiff as some "white power" spokesperson at the Center.  Finally, the

plaintiff asserts, her failure to learn about the operations of and perform effectively in her

supervision of Residential Life and Training was a consequence of Eoff's not providing her the

necessary training and of having not been given access to books on protocol in the Residential

Life and Training area.[10]

On December 6, 1995, the plaintiff was walking to the Academics building in order

to obtain copies of the recent Department of Labor quarterly survey when she was stopped by

Caren Wrenn, the Supervisor of Academics, and asked if she was going to attend a meeting to

discuss the date on which certain Center documents, termed "P/PEPs", were due.[11]  The

plaintiff replied that she knew nothing of the meeting and that, as she had been uninformed

of the meeting, she would not attend.  At the meeting, at which only Eoff, Exford and Wrenn

were present, the date on which the P/PEPs would be due was moved from January 12 and

13 of 1996 to December 15, 1995.  On December 12, 1995, Wrenn informed her staff of the

due date for the P/PEPs.  This staff, in turn, informed the plaintiff of the due date for the

---

[9]  In support of this contention, the plaintiff presents copies of her work schedule for February
and March of 1996, indicating that she worked evening hours at the Residential Area of the Campus.
This evidence is not relevant to the time period of the October month, however.  She also includes
statements in a journal allegedly written contemporaneously with the events giving rise to the instant
suit occurring after November 13, 1995, in which plaintiff indicates that she is spending time at the
Residential Area of Campus and indicating that Residence Assistants of the Residential area state that
they do not often see Exford, who is required to spend time at the Residential area.  As Eoff's
complaint is allegedly based upon Exford's report, Exford's absence from the Residence area could be
indicative of dissembling by Exford on the issue of plaintiff's presence or absence in the Residential
area in the attempt to encourage Eoff to draft an inaccurate evaluation.

[10]  The defendant contends that it was not required to give the plaintiff any books on
procedure at MINACT-run facilities, as one had yet to be compiled for the Center in Gadsden and
Eoff and Exford were relying on procedure books from other facilities.  However, that these employees
had access to these books, which were used by them in performing everyday functions, while Gartman
was denied a copy of any manual on procedure, except under limited conditions, placed Gartman at a
disadvantage not shared by both her supervisor *and* her subordinates.

[11]  The ultimate responsibility for preparing the P/PEPs fell with the plaintiff.

documents. Unlike Wrenn's staff, who were present to complete the P/PEPs, the staff in the Vocational area, which the plaintiff directly supervised, had been released for Christmas vacation. The plaintiff then confronted Eoff, who refused to change the date back to January of 1996 and apparently threatened the plaintiff with blame if the P/PEPs were not on time. Plaintiff then worked through the night of December 12 and into December 13 to complete the P/PEPs for the vocational department.

On December 13, 1995, Eoff called the plaintiff into her office and accused the plaintiff of not having completed the P/PEPs. The plaintiff responded that she had left the forms on Exford's desk.[12] Eoff refused to believe the plaintiff and then stated that she had been told by Exford that the plaintiff was not providing "completion projections" to the certain staff meetings. The plaintiff replied that, in fact, she updated completion projections weekly and distributed those materials at each meeting.

Finally, Eoff accused the plaintiff of failing to submit information on the vocational aspect of operations for the Gadsden operating procedures handbook. The plaintiff responded that she had turned in the material late, but that it was not her tardiness that was causing production of the handbook to run behind schedule. Rather, plaintiff reported, Exford had failed to turn in his materials.[13] Finally, before the meeting completed, Eoff told the plaintiff that she had not adapted to working for MINACT and that it was rumored that the plaintiff was leading a faction of white staff who had failed to adapt to MINACT management.[14]

---

[12] Apparently, the only P/PEP forms that were not filled out on time were those for which Exford was responsible. Exford did not, however, suffer any negative consequences as a result of his failure.

[13] Apparently, Exford was never cited for this failure.

[14] The defendant states that on December 15, 1995, Richard Greene ("Greene"), Executive Director of Training for MINACT, toured the Center and made note of various problems with areas under the plaintiff's supervision. However, not only is the memorandum somewhat indecipherable in its contents, it is addressed to Eoff, not to the plaintiff. Further, some of the notes do not seem to cite anyone for problems, but to offer suggestions with regard to how the Center might better function. Nonetheless, the plaintiff, in her deposition testimony explained what she remembered about those items in the memorandum addressed to her departments. The first comment directed to one of her departments was a note about an absence of documentation concerning visitations to vocational classes. The plaintiff responded that, in fact, it was a legitimate concern and something of which she needed to take care. The defendant did not inquire whether the plaintiff completed this task and, in the absence of any indication that the plaintiff failed to complete this task,

  
On December 15, 1995, the plaintiff was informed by one of the Residence Assistants at the Center dormitories that Exford had reported to work inebriated. Gartman, in turn, told Eoff of the report; Eoff told the plaintiff that she would take care of the situation. Apparently, Exford was never disciplined.

The plaintiff did not receive her evaluation for the period ranging from November 1, 1995, to November 30, until January 15, 1996. Much of the evaluation deals with future goals of the Center for which Gartman is given responsibility. In that evaluation, Eoff complains that the plaintiff remains reserved, that the failure rate for students taking the GED examination is too high, that the plaintiff failed to visit the Residential area during the thirty days, that the plaintiff did not turn in the P/PEP evaluations for the month of December 1995, and that the vocational areas were not clean — i.e., that there was too much dust in the air in the vocational classes and that scrap materials were not being promptly disposed. Two of these complaints were mere rehashes of statements made and debunked in the plaintiff's meeting with Eoff on December 13, 1995. The evaluation completed with the notation that if the plaintiff's performance did not improve by the end of the ninety days (which had, by the time the evaluation was drafted, already passed), she would be subjected to more serious actions including "having to make some decisions about her work assignment."

On January 29, 1995, Eoff presented the plaintiff with a ninety-day evaluation, in which Eoff again indicated that the plaintiff's job knowledge with regard to the Residential Life and Training was inadequate,[15] and repeating concerns listed in the sixty-day evaluation. Six weeks later, on March 15, 1996, the plaintiff was terminated by MINACT.

---

the court assumes that the plaintiff did, in fact, complete it. Another notation directed to her department was the need for procedures for monthly meetings in the vocational department. Again, the plaintiff noted that drafting such meeting procedures was something that she needed to do. The plaintiff could not recall whether this task was ever completed. Finally, Greene commented on how a procedure for making certain that information concerning students who dropped classes was recorded so that the Center did not have to pay Gadsden State for the student's tuition for a class that the student was not taking. The plaintiff responded that Greene made the notation because he had not been made aware that a procedure was actually in place.

[15] This notation was made despite the fact that the plaintiff was never given the training promised by Eoff at the interview.

## Contentions & Analysis

As noted by the defendant, the plaintiff apparently raises claims of disparate treatment and of harassment based upon race in her complaint. The plaintiff's disparate treatment claims are predicated on four allegedly adverse employment actions.[16] First, the plaintiff complains of not having received training in the Residential Life and Training aspects of her position, including not being sent to a training session for which she was qualified when two of her subordinates who were African-American were sent to such training; second, she complains that she was not permitted access to the procedures manual to which her co-employees, supervisor and subordinates were given access; third, similarly situated black employees earned more wages than the plaintiff and four, she was terminated by the defendant. The plaintiff's harassment claim grows out of remarks made by Exford and Eoff that she sought to divide blacks and whites at the Center and that she thought of herself as the base of a white power movement at the Center.

---

[16] Being pro se, the plaintiff in the instant action largely relies upon the framework posited by defendant's formulation of the relevant law. However, the court is not in any way bound to follow the defendant's misinterpretations or exclusions in the interpretation of the law and will, rather, explicate the law as it sees it to be and apply the facts appropriately.

However, the court notes, the fact that the plaintiff relies upon the legal assertions of the defendant in its brief in crafting her response demonstrates the disadvantage to which she is exposed in proceeding pro se. The plaintiff, not fully aware of the relevant law, leaves herself open to attacks by the defendant that she might not be required to rebuff or to which she might not fall prey if she were to obtain a lawyer. It may be a bit of an exaggeration, but a pro se plaintiff attempting to take on a defendant represented by a large, well-financed law firm stocked with talented attorneys, is akin to an unarmored person with a pea-shooter trying to take down a juggernaut. While the plaintiff has demonstrated a genuine issue of material fact with regard to her claims, she has reached the summary judgment standard only weakly, in large part due to her unfamiliarity with the law and the consequent inability to highlight facts pertinent to proving a claim under that law. The court advises the plaintiff that obtaining counsel would permit her to make her case in a stronger fashion (the Alabama Bar Association would be able to suggest attorneys quite capable of handling the plaintiff's case); however, this is the plaintiff's case and she is free to pursue it as she sees fit, with or without legal counsel.

I. DISPARATE TREATMENT.

Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a & 2000e, *et seq.*, and the Civil Rights Act of 1871, 42 U.S.C. § 1981, prohibit discrimination by an employer against an employee on the basis of that employee's race. *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999). In a discrimination suit, a plaintiff can make her case either through giving direct evidence, "such as age-biased [or gender-biased] statements made by the decision maker," by use of circumstantial evidence or "by presenting a statistical pattern of discrimination." *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997). *See also Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997). There is no indication that the plaintiff seeks to prove her case by means of statistical evidence. In addition, the plaintiff is incapable of proving her case through direct evidence.[17] Thus, the plaintiff's case rests solely on her proving, through circumstantial evidence, that she was discriminated against in each adverse employment decision to which she was subjected.

> . . . The seminal disparate treatment case, *McDonnell Douglas Corp. v. Green*, articulated the procedure for a plaintiff to put forth a prima facie case of discrimination. 411 U.S. 792, 802 [] (1973). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

*Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 1999 WL 216239 at *4 (11th Cir. 1999). Nor must the plaintiff, in attempting to demonstrate a case of discrimination through circumstantial evidence, be restricted to any specific formulaic test.

---

[17] Direct evidence of discrimination is evidence which, without inference or presumption, could lead a trier of fact to conclude that discrimination occurred. *Carter v. City of Miami*, 870 F.2d 578, 580-81 (11th Cir. 1989). Because "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself," the Eleventh Circuit Court of Appeals "has marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998). A few isolated words unrelated to the employee's position or to a relevant hiring, promotion or termination decision will not create direct evidence. *Id.* Further, "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Plaintiff has not demonstrated the existence of remarks which are directly related to the decision-making process by anyone who affected any adverse employment decision.

Rather, under *McDonnell Douglas*, the court should be flexible in articulating the standards by which a plaintiff may raise an inference of discrimination.[18] *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999) ("We have repeatedly emphasized that the requisite showings that make up a prima facie case are not meant to be rigid or inflexible.").

In the instant case, the plaintiff seeks to prove her circumstantial evidence case under the burden-shifting analysis set forth in *McDonnell Douglas*. *Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998). Under this burden-shifting framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Eskra v. Provident Life and Acc. Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir. 1997). If she meets that burden, then a presumption arises that the challenged action by the employer was motivated by a discriminatory intent. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Jones v. Gerwens*, 874 F.2d 1534, 1538 (11th Cir. 1989). The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment action. *Burdine*, 450 U.S. at 254-55. If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination. *Id.* at 255-56. *See also Brooks v. Norfolk Southern Ry. Co.*, CV 98-BU-260-S, Memorandum Opinion at 7-8 (N.D. Ala. April 1999).

## A. DENIAL OF TRAINING.

The plaintiff complains that Eoff denied her adequate training because of her race such that she could not perform the functions of her job. One particular training session that the plaintiff complains that she did not receive because of her race that was provided to individuals who were black was MINACT Quality Management Training, which Exford and Sheila Cooper received. The defendant contends, citing *Holifield v. Reno*, 115 F.3d at 1563, that the plaintiff can only demonstrate a *prima facie* case that the denial of training to her was

---

[18] For example, the burden-shifting analysis set forth in *McDonnell Douglas* is not the sole method by which a plaintiff can, through circumstantial evidence, present a case of race discrimination.

discriminatory if (1) she is a member of a protected class, (2) she was denied a condition or benefit of employment and (3) that the condition or benefit was received by a similarly situated person outside of the protected class. The defendant contends that the plaintiff has failed to demonstrate her *prima facie* case because she cannot show that similarly situated individuals were given MINACT Quality Management Training ("MQM training") while she was denied it. Exford was a supervisor and Cooper was a manager, both of whose positions involved the training of subordinates, states the defendant. By contrast, the defendant avers, the plaintiff held an entirely different position, that of program director, and training other employees was not a part of her job functions.

> . . . As part of the Title VII plaintiff's prima facie case, the plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than herself. *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11ᵗʰ Cir. 1995). To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1ˢᵗ Cir. 1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6ᵗʰ Cir. 1992); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8ᵗʰ Cir.1985), *cert. denied*, 475 U.S. 1050, [](1986).

*Holifield v. Reno*, 115 F.3d at 1561. In the typical case in which a plaintiff seeks to have his or her case compared to another employee who was treated differently is a case in which a plaintiff alleges to have been the victim of selective disciplinary action based upon race. *Cf.*, *id.* In those cases, determining whether comparators are sufficiently similar involves an analysis of whether " the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id. See Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, (11ᵗʰ Cir. 1998), *superceded in part*, 151 F.3d 1321 (11ᵗʰ Cir. 1998), *reh'g en banc denied*, 162 F.3d 1179 (11ᵗʰ Cir. 1998). In comparing conduct meriting the disciplinary action, it must be the case "that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11ᵗʰ Cir. 1999).

In a *prima facie* case of discrimination, substantial similarity is *functional identity*. That is, the determination of whether two employees are substantially similar for purposes of the

*prima facie* case is dependant upon whether the employee and the comparator both meet any sufficient criteria for the employment related action or benefit at issue.[19]  For example, A is disciplined and B, a member of a different race, is not disciplined.  The criteria for such discipline is either work tardiness or disheveled appearance.  A arrived at work tardy and B arrived at work disheveled.  Although both meet different criteria for the same punishment, each meets a sufficient criteria, listed in the disjunctive, for the punishment.  Therefore, A and B are similarly situated and A's being punished while B went unpunished will contribute to A's *prima facie* case of discrimination.  For another example, assume that A and B both seek a benefit, the criteria for which is that the individual have a certain sales record.  B receives it while A does not.  In almost all respects, A and B are the same: they hold the same positions, sell in the same territory, have access to the same materials, share a supervisor, and so forth, except that, while B has the requisite sales record, A does not.  A cannot demonstrate that she was similarly situated to B, because the criteria for the job benefit was not satisfied by A.  Similarly, if A was a manager whose job functions did not include sales, she would not meet the criteria for receiving the job benefit.

In the instant case, as stated by the defendant, the criteria for receiving MQM training satisfied by Cooper and Exford, was that the persons being sent to such training be individuals whose job functions involve the training of others.  Therefore, for Gartman to have been similarly situated to Cooper and Exford for purposes of receiving the MQM training, her job duties must include the training of others.  While the defendant denies that this is the case, a glance at the plaintiff's job description indicates to the contrary.  Among her primary duties, the program director "*[d]evelops* and *implements* in-service *training* for the

---

[19]  The purpose of the substantial similarity requirement is to ensure that the plaintiff can show that the employer treats employees of one class more favorably than employees of another class, i.e., that the employer parcels out benefits and punishments on the basis of something other than qualification for punishment.  The unexplicated requirement that parties have nearly identical histories, in the abstract, is useless for two reasons: First, the test is not tied, by that definition, to the term and conditions of plaintiff's employment and provides no basis for distinguishing irrelevant discrepancy from meaningful difference between comparators.  Second, and more importantly, it would permit employers to discriminate, for race or other reason, among individuals who satisfy the requirements for a benefit or punishment on the basis that different aspects of the criteria are satisfied, without ever having to posit an explanation for that discrimination.

division's staff." The program director is also responsible for "evaluat[ing] and *train[ing]* departmental and Center staff." Defendant's Resubmission of Evidence in Support of Motion for Summary Judgment, I at 1-2 . Therefore, the plaintiff has presented a *prima facie* case of discrimination with respect to the MQM training issue. As the defendant has not articulated a legitimate non-discriminatory reason for failing to provide the training the plaintiff is entitled to proceed to trial on this issue.

The defendant argues, with respect to training in the Residential Life and Training area of her job that the plaintiff claims she was denied, that Shola Ajibola ("Ajibola"), the other director-level individual at MINACT received equally as many training sessions as the plaintiff. Perhaps so, but elements of the *prima facie* case articulated by the defendant are not wholly applicable to this case, as Ajibola is not a functionally similar comparator to the plaintiff; he did not have authority over Residential Life and Training and, as such, any training in Residence Life and Training would have no impact upon his job functions or duties.

Instead, the plaintiff asserts that Eoff promised her training in the area of the job for which she was not experienced and, after Exford began to accuse the plaintiff of being decisive on the basis of her race, Eoff decided not to give the training because she developed race-based hostilities towards the plaintiff. While the plaintiff has set forth indications that Eoff might have harbored a racial animus against the plaintiff, she has not put forward evidence that would tie the decision not to provide her with training to that animus. The purpose of the *prima facie* case is either to create an inference from an adverse job action that racial intent exists or to tie a free floating racial animus toward and individual to a specific job action. The failure of the plaintiff to develop a *prima facie* case in this instance makes it impossible for the court to tie any animus by Eoff to the failure to provide the plaintiff with training. The defendant's motion for summary judgment will be GRANTED with regard to this aspect of the plaintiff's claims.

B. REFUSAL OF ACCESS TO PROCEDURE MANUALS.

The plaintiff claims that she was not provided copies of procedure manuals that would have aided her in the completion of her job, while other employees who were black either had copies of or were given more favorable access to the procedure manual. While it is the case that the plaintiff did not have copies of the procedure manual and perhaps she should have been provided with a copy of that manual, those individuals with procedure manuals brought them from other MINACT-operated Job Corps Centers. The plaintiff cannot argue that her failure to obtain a manual on that basis was a discriminatory action. Therefore, the plaintiff's complaint that she was not provided with a procedures manual must derive from the discriminatory distribution of copies of one of the manuals among employees. That is, the plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she did not receive a manual from Eoff; and (3) that Eoff provided the manual to other individuals outside of the plaintiff's class with fewer restrictions. The plaintiff cannot demonstrate that any black employee of MINACT who did not already possess a copy of the procedures manual had less restricted access to the manual than the plaintiff. The plaintiff fails to state a *prima facie* case that she was denied access to or copies of the procedures manual. On this issue, summary judgment will be GRANTED.

## C. UNEQUAL PAY.

The plaintiff claims that she received unequal pay because of her race. The defendant states that it did not discriminate against the plaintiff in the wages she was paid because the only other person at the Center in a director position, Ajibola, a black male, was paid the same amount as the plaintiff. The plaintiff responds that she was paid less than others in her position because, after her termination, the program director position that she occupied was divided into two positions and the individuals, both black, who occupied those positions were paid more than she was paid while she occupied the program director position.[20]

---

[20] These two individuals were Alexander Alston, who was hired as the Director of Social Development at a starting salary of $46,000.08 and Sandra Speight, who was hired as the Director of Training at a starting salary of $48,000.00.

"To establish a *prima facie* case of racial discrimination with respect to compensation, the plaintiff must show that he was paid less than a member of a different race was paid for work requiring substantially the same responsibility." *Pittman v. Hattiesburg Municipal Separate School Dist.*, 644 F.2d 1071, 1073 (5th Cir. 1981). *See Walton v. Cowin Equipment Co., Inc.*, 774 F.Supp. 1343, 1345 (N.D. Ala. 1991) (J. Acker), *affirmed*, 941 F.2d 1348 (11th Cir. 1992), and *Ray v. Peabody Institute of Johns Hopkins University, Conservatory of Music*, 1993 WL 56789 at *1 (D. Md. 1993). With regard to disparate claims, "[t]he standard for 'similarity' in Title VII cases is relaxed," in comparison to claims raised under the Equal Pay Act. *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 597 (11th Cir. 1994).[21] Therefore, a Title VII plaintiff may establish a *prima facie* case of race discrimination if he or she demonstrates that he or she occupies a job similar to that of a higher paid member of another race. *See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997) (citing *Meeks v. Computer Associates International*, 15 F.3d 1013, 1019 (11th Cir. 1994) and noting that "the Supreme Court in *County of Washington v. Gunther*, 452 U.S. 161, 168-71, 180-81 [] (1981), determined that the [Equal Pay Act's] requirement that a plaintiff prove equal work does not apply to Title VII").

While defendant attempts to isolate Ajibola as the sole comparator to the plaintiff, this position is incorrect. A reasonable jury could find a genuine issue of triable fact as to whether, after the plaintiff was terminated, the position she occupied was divided into two positions, each of which had fewer responsibilities and that the two persons hired into those positions, both black individuals, were paid more than plaintiff.[22] Therefore, the plaintiff raises a triable *prima facie* case of discrimination. As the defendant has not proposed any

---

[21] *But see Kindred v. Northome/Indus. Sch. Dist.*, 154 F.3d 801, 803 (8th Cir. 1998), *cert. denied*, — U.S. — (holding that standards in an unequal pay claim are the same for Equal Pay Act and Title VII claims).

[22] The defendant attempts to debunk the argument that the two black individuals hired into the two positions carved from the plaintiff's job were dissimilar from the plaintiff because those two had prior director-level experience at other Job Corps Centers and therefore were entitled, by experience, to a greater salary. However, the plaintiff had similar director-level experience at the Gadsden Job Corps Center prior to her being hired by MINACT. A reasonable trier of fact could determine that the distinction is a distinction without a difference.

legitimate non-discriminatory reason for the unequal pay, its motion for summary judgment on this claim is therefore DENIED.

## D. TERMINATION.

The defendant, in contending that the plaintiff cannot raise a genuine issue of triable fact regarding its claims that she was terminated on the basis of her race, argues, first, that the plaintiff cannot present a *prima facie* case that she was terminated because of her race and second, that she cannot demonstrate that its legitimate non-discriminatory reason for her termination were pretext.

The defendant asserts that the plaintiff, although she is a member of a protected class and although she was subjected to an adverse job action, cannot present a genuine issue of triable fact supporting her *prima facie* case, one, because she was not qualified for her position and, two, because she cannot show that she was replaced by someone outside of the protected class. The issue of whether the plaintiff was qualified for the position is bound up in the allegedly non-discriminatory reasons given by the defendant to terminate the plaintiff. "Because the issue of [Gartman's] job performance is intertwined with the issue of whether [her] termination was pretextual, [Gartman's] job performance will not be examined until a later stage of the *McDonnell Douglas* analysis." *Holifield v. Reno*, 115 F.3d at 1562 n.3.[23]

---

[23] In *Brooks v. Norfolk Southern* Ry., CV 98-BU-260-S at * 9, this court stated that: In determining whether a plaintiff is "qualified" for a sought position, within the context of an ADEA or Title VII plaintiff's prima facie case, the inquiry is directed towards whether she possesses the *minimum* qualifications for the position, as opposed to whether the plaintiff possesses certain qualifications or attributes that might be considered merely preferable. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 643 (11th Cir. 1998) (noting that of three "position requirements" articulated by employer, "education, experience, and special knowledge," "only education was treated as a minimum requirement"); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1209 (11th Cir. 1997) (holding that plaintiff satisfied burden to show he was qualified for a position, where position description listed two years experience on computer program as "ideal," but not a minimum requirement). This is in accord with the general rule that a plaintiff's burden in establishing a prima facie case is not onerous. *See Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991), *citing Burdine*, 450 U.S. at 253.

Further the court finds that the plaintiff has satisfied the other requirement of stating a *prima facie* case, that she was replaced by individuals who are outside of the protected class. For the same reasons stated with respect to plaintiff's unequal pay claim, the court finds that the plaintiff has raised a genuine issue of material fact as to whether she was replaced by individuals outside of the protected class.

The defendant asserts as a legitimate, non-discriminatory reason for the plaintiff's termination that her work was unsatisfactory. The plaintiff responds that the evaluations indicating a deficiency in her performance were exaggerated and based upon information that Eoff, the evaluator, knew to be false.

> Once a defendant articulates a legitimate, non- discriminatory reason for its action, the initial inference of discrimination "drops" from the case. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 [] (1993). The burden then shifts back to the plaintiff to show that the proffered reason was pretext for intentional discrimination and that the defendant intentionally discriminated against him. *Burdine*, 450 U.S. at 256 []. A plaintiff may show pretext and survive summary judgment by "presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 965 (11th Cir. 1997) (citations omitted); *see Hicks*, 509 U.S. at 511, [] (1993) ("The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination.").

*Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir. 1999).

The plaintiff can demonstrate pretext either by demonstrating that the offered reason for the termination is false or by presenting other evidence that would indicate a discriminatory animus by the decisionmaker. Here, the plaintiff has raised a genuine issue of triable fact as to both manners of demonstrating pretext. As indicated in the fact section of this opinion, the plaintiff has demonstrated that many of Eoff's reasons for the plaintiff's low

---

In footnote 3 of that opinion, this court then noted that "[a] factor which is not a minimum qualification may constitute a legitimate, non-discriminatory reason for the adverse employment action, however. *See Wileman v. Frank*, 979 F.2d 30, 37 (4th Cir. 1992)." The reasons for not including what are ostensibly legitimate, non-discriminatory reasons for termination into the *prima facie* case of the plaintiff are applicable here — the plaintiff meets the minimum job qualifications. Whether the plaintiff is actually performing the job she is qualified to do is a matter to be developed in explication of the legitimate non-discriminatory reasons for the termination.

evaluations were false and were known to be false by Eoff at the time the evaluations were made. Further, one of the evaluations given to the plaintiff stated that the plaintiff had to improve within the next thirty days after the evaluation period, but was not presented to the plaintiff until six weeks after the evaluation period ended. This creates an inference that the reasons presented by the defendant were not contemporaneous with any misbehavior of the plaintiff, but were after-the-fact rationalizations that were used to cover for an illegitimate motivation.

In addition, if the plaintiff is to be believed, Eoff made numerous comments to the plaintiff from which a reasonable trier of fact could find that Eoff believed, because the plaintiff was white and Exford, of whom the plaintiff complained, was black, that the plaintiff's problems with Exford were based on racial animosity rather than for legitimate reasons. There is further reason for a jury to conclude that Exford encouraged this race-baiting in Eoff's presence and thereby tainted Eoff's decisions with his own race-based animosity toward the plaintiff. Summary judgment on the termination claim will be DENIED.

## II. RACIAL HARASSMENT.

Title VII prohibits not only tangible adverse treatment of an employee on the basis of his or her being a member of a protected class, but also prohibits harassment of that employee on the basis of his or her being a member of the protected class. Most harassment claims involve sexual discrimination, in which an employee is subjected to harassing treatment on the basis of "sex." However, the law applicable to sex-based harassment claims is equally applicable to harassment claims arising out of the hostile and abusive treatment of a member of a particular race. As a general matter, a plaintiff seeking to prove a claim of racial harassment must demonstrate harassment that is "'sufficiently severe or pervasive' to change the conditions of employment and create an offensive work environment." *Dees v. Johnson Controls World Services, Inc.*, 168 F.3d 417, 421 n.8 (11th Cir. 1999) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 [] (1986). "The harassment must be both subjectively and objectively offensive — the plaintiff must show both that a reasonable person would find the

environment 'hostile or abusive' and that she actually did find the environment to be offensive." *Id* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 [] (1993)).

In *Faragher v. City of Boca Raton*, — U.S. —, —, 118 S.Ct. 2275, 2283-84 (1998), the Supreme Court discussed what kind of behavior would constitute actionable harassment under the anit-discrimination laws:

> . . .[I]n *Harris*, we explained that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. 510 U.S., at 21-22 []. We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, at 23 []. Most recently, we explained that Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale*, 523 U.S., at —. A recurring point in these opinions is that "simple teasing," id., at —, 118 S.Ct., at 1003, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."
>
> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Id.*, at ----, 118 S.Ct., at 1002. Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 175 (1992) (hereinafter LINDEMANN & KADUE) (footnotes omitted). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. *See, e.g., Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-750 (C.A.8 1986); *See also* 1 LINDEMANN & GROSSMAN 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

The defendant argues that the plaintiff's claim of racial harassment cannot succeed, as no reasonable trier of fact could find that the comments made by Exford and Eoff were sufficiently severe or pervasive to be actionable. The court agrees. While the plaintiff may have been troubled by the race-based comments and misapprehensions of her subordinates and superiors, those offhand comments are not alone sufficient to permit a reasonable trier of fact to find an objectively hostile or abusive working environment. The defendant's motion

for summary judgment on the racial harassment claim will be GRANTED.  The plaintiff's claim
of racial harassment will be DISMISSED.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment will be
GRANTED, in part, and DENIED, in part.  The plaintiff's claims of sexual harassment and her
claims of disparate treatment based upon lack of access to a procedures manual and based
upon lack of training, except as with regard to the MINACT Quality Management Training,
will be DISMISSED, with prejudice. As to the dismissal of certain claims, the court finds that as
a matter of law there are no genuine issues of material fact.  All other claims may proceed to
trial.[24]  The remaining claims which may proceed to trial are the plaintiff's claims that she
was subjected to disparate treatment (1) when she was terminated, (2) when she was not
offered MINACT Quality Management Training and (3) because she received less pay than
the successors to her position.

DONE and ORDERED this **3rd** day of June 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE

---

[24]  The court would advise the parties, however, that it sees this case as an appropriate one for
mediation and settlement.